UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MOLLY COSEL,<br><br>    Plaintiff,<br><br>v.<br><br>GEOFFREY C. WENDT as TRUSTEE OF THE WILLIAM G. WENDT 2022 FAMILY TRUST,<br><br>    Defendant. | Civil Action No. 22-30113-MGM |

MEMORANDUM AND ORDER ON
CROSS MOTIONS FOR SUMMARY JUDGMENT
(Dkt. Nos. 79 & 83)
April 1, 2025

MASTROIANNI, U.S.D.J.

## I.   INTRODUCTION

This case concerns a dispute about the ownership and control of a piece of real property located at 40A McCarthy Road, Tyringham, Massachusetts ("the Property") following the dissolution of the marriage between Molly Cosel ("Molly" or "Plaintiff") and Will Wendt ("Will"). Originally, the Property was part of a larger parcel owned by Molly's parents. In 2016, approximately two years after Molly and Will married, Molly's parents deeded the Property to Molly and Will as tenants by the entirety. Molly, Will, and their children lived together in a converted barn on the Property from 2016 until Molly filed for divorce from Will on February 6, 2020. Between 2016 and 2019, Will received approximately $3 million dollars from his parents, Bill and Dalia Wendt ("Bill and Dalia"), which was spent on site work and construction of an accessory building at the Property. In December 2019 he alone signed a promissory note in which he agreed to repay $1.5 million to his

parents (the "Promissory Note"). He did not repay the money and, while his divorce from Molly was pending, his parents secured a default judgment against him for more than $1 million. An execution was issued and attached to Will's "undivided one-half interest" in the Property.

On July 22, 2022, a Massachusetts court entered a judgment of divorce nisi requiring Will to convey his interest in the Property to Molly prior to the divorce becoming final and making him solely responsible for satisfying the promissory note he had signed in favor of his parents. Before Will transferred his interest in the property to Molly, Bill and Dalia assigned their interest in the default judgment to their son Geoffrey C. Wendt ("Geoffrey" or "Defendant") as Trustee of the William G. Wendt 2022 Family Trust ("2022 Trust"). On August 12, 2022, their attorney issued a Notice of Sheriff's Sale on Execution of Will's "undivided one-half interest" in the Property.

Seeking to prevent the foreclosure sale, Molly filed this action in state court on August 19, 2022. Bill and Dalia removed the case to this court based on the diversity of the parties. This court entered a temporary restraining order postponing the sale and later adopted the parties' assented-to motion for preliminary injunction. (Dkt. No. 28.)

Geoffrey, in his capacity as trustee of the 2022 Trust, was added as a defendant and the claims against Bill and Dalia were dismissed. He answered the Complaint and asserted counterclaims against Molly. The counterclaims assert both that the 2022 Trust currently possesses rights in the Property that can be sold at public auction and that Molly is jointly and severally liable for the debt, despite not signing the Promissory Note because funds were used to provide "necessaries" for the family. The parties have now completed discovery and moved for summary judgment.

The core dispute is a purely legal question about how Massachusetts law treats a lien incurred by one spouse secured by property held as joint tenants by the entirety when a divorce judgment awards the property solely to the non-debtor spouse. Plaintiff takes the position that she is entitled to summary judgment because the interest in the Property she received in the divorce was

not subject to any liens incurred solely by Will. Conversely, Defendant argues the divorce judgment does not vitiate the rights previously acquired by Bill and Dalia, and later transferred to the 2022 Trust. In the absence of contrary authority, the court has concluded that under Massachusetts law an interest in property held as tenants by the entirety is automatically terminated when a marriage ends, along with any expectancy held by a creditor of a spouse who subsequently has no individual interest, regardless of whether the marriage is terminated by divorce or the death of one spouse. The court granted Plaintiff's motion for summary judgment and denied Defendant's motion in a short order issued March 31, 2025. The court's reasoning follows.

## II.   LEGAL STANDARD

"The function of summary judgment is 'to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Burt v. Bd. of Trs. of Univ. of R.I.*, 84 F.4th 42, 59 (1st Cir. 2023) (quoting *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir. 1990)). "Summary judgment is appropriate 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Bellone v. Southwick-Tolland Reg'l Sch. Dist.*, 748 F.3d 418, 422 (1st Cir. 2014) (quoting Fed. R. Civ. P. 56(a)). "The fact that the parties have filed cross motions . . . does not alter these general standards." *Gibson Found., Inc. v. Norris*, 88 F.4th 1, 5 (1st Cir. 2023). Each party's motion is reviewed "independently, viewing the facts and drawing inferences as required by the applicable standard." *Id.* at 6.

"Facts are material when they have the 'potential to affect the outcome of the suit under the applicable law,'" and disputes are genuine when a reasonable jury considering the evidence "'could resolve the point in the favor of the non-moving party.'" *Cherkaoui v. City of Quincy*, 877 F.3d 14, 23-24 (1st Cir. 2017) (quoting *Sánchez v. Alvarado*, 101 F.3d 223, 227 (1st Cir. 1996)). "[I]f there is a genuine dispute of a material fact, that dispute would 'need[] to be resolved by a trier of fact.'" *Doe v. Trs. of*

3

*Bos. Coll.*, 892 F.3d 67, 79 (1st Cir. 2018) (quoting *Kelley v. LaForce*, 288 F.3d 1, 9 (1st Cir. 2002)) (second alteration in original). Undisputed facts must be viewed "in the light most favorable to the non-moving party." *Carlson v. Univ. of New England*, 899 F.3d 36, 43 (1st Cir. 2018). The court draws all reasonable inferences in favor of the non-moving party; but does not "draw <u>unreasonable</u> inferences or credit bald assertions, empty conclusions, rank conjecture, or vitriolic invective." *Cherkaoui*, 877 F.3d at 23 (internal quotations omitted) (emphasis in original).

### III. FACTS[1]

Molly and Will married in 2014. They had their first child in 2015 and a second child in 2016. Molly's parents owned a large parcel of land containing their home and a second structure, known as the Red Barn, which had been converted into living space many years earlier. Molly and Will moved their family into the Red Barn in 2016. That same year, Molly's parents subdivided their parcel to create the Property, which includes the Red Barn and approximately five acres. They gifted the Property to Molly and Will, who took title as tenants by the entirety on July 1, 2016. Even before they owned the Property, Molly and Will began discussions about renovating the Red Barn to better accommodate their family. After exploring options, they agreed to tear it down and build a new single-family home. They also agreed to first build a photography studio for Will, with living quarters where their family could stay while building their new home. The parties agree that in June 2016, Molly and Will were collaborating on the design and budget for the project, though they disagree about Molly's involvement and knowledge of the project and spending after June 2016.

The funds for the construction project came from Will's parents. In 2012, Bill and Dalia placed $1 million in a trust set up for the benefit of Will. They specified that the funds were to be used for the purchase or construction of a new home, and they directed their CPA to track the

---

[1] These facts are undisputed unless otherwise noted.

earnings from the $1 million gift separately from the other funds in the trust. By 2016, the amount available to Will for the purchase or construction of a home had grown to $1.9 million. Sometime during 2016, the full $1.9 million was transferred from the trust to an account that could be directly accessed by Will. All the money in the account was spent between 2016 and November 2017. There are disputes about whether all the money was actually spent on construction at the Property and about the level of Molly's involvement, including whether design and spending decisions made during this period were made solely by Will.

In November 2017, Bill and Dalia learned that the entire $1.9 million had been spent without completing construction of the photography studio and living quarters. Defendant contends Bill and Dalia told Will and Molly that they would loan additional money to complete the project. However, Molly testified at her deposition that she was not involved in any discussions with Bill and Dalia about a loan, and she contends they planned to gift Will the additional funds. Construction on the Property continued in 2018 and 2019, funded by payments Will received from Bill and Dalia. There was no contemporaneous written documentation regarding the payments, including as to whether they were gifts or loans. By late 2019, these payments added up to more than $1.5 million above the $1.9 initially spent between 2016 and 2017. When the payments from Bill and Dalia ceased, the exterior of a new building was largely complete, but, despite the significant sums spent on the project, a large part of the interior work remained unfinished, and the planned living space was not habitable.

Unfortunately, Molly and Will's marriage became strained and in February 2019, Molly told Will that she wanted to end their marriage. They did not immediately separate, and Will did not inform his parents about the marital problems. He continued accepting money from his parents to fund construction at the Property until November 2019, when Bill and Dalia first learned the marriage was in trouble. In December 2019, Bill and Dalia presented Will with a promissory note

5

that provided for the repayment of the $1.5 million in funds he had received since November 2017. Will signed the promissory note on December 14, 2019, without telling Molly.

The parties disagree about whether the Promissory Note is valid. To briefly summarize, Defendant asserts the Promissory Note was merely a formality drawn up at the advice of Bill and Dalia's CPA to memorialize an agreement that already existed. Plaintiff asserts the note was a sham because Will, Bill, and Dalia all knew when Will signed it that he would not be able (and did not intend) to abide by its terms. These disputes can only be resolved by a factfinder and, if material, they would foreclose summary judgment for either party.

On February 6, 2020, Molly filed a complaint for divorce from Will with the Massachusetts Probate and Family Court, and she moved out of the Red Barn. She initially stayed with her parents and later rented an apartment in a nearby town. In an affidavit Molly signed several weeks after filing for divorce she stated that she had moved out of the marital home to avoid uncomfortable interactions with Will and hoped to return to the home after their divorce.

Will did not meet his obligations under the promissory note and in November 2020, Bill and Dalia filed suit against him in Superior Court. Molly received no notice of this action and Will did not appear or take any steps to fight the action. On December 23, 2020, a default judgment in the amount of $1,112,514.35 was entered against Will in favor of Bill and Dalia. The court issued an execution against Will's interest in the Property on February 9, 2021. The judgment and execution were recorded by the Berkshire County Sheriff's Department at the Registry of Deeds on March 2, 2021. Molly did not learn of the judgment lien entered against Will until almost six months later on August 23, 2021.

In the meantime, Bill and Dalia initiated a separate lawsuit against Molly (and others) in June 2021. They sought to hold Molly personally liable for amounts owed under the Promissory Note signed by Will pursuant to Mass. Gen. Laws c. 209, § 1. Molly filed a motion to dismiss the action

and moved, in the alternative, for the case to be stayed pending completion of the divorce proceedings. After hearing argument, the Superior Court denied the motion to dismiss and granted the motion to stay. Bill and Dalia unsuccessfully moved for reconsideration and then filed an interlocutory appeal, which was denied on May 26, 2022.

During this same period, the divorce action was working its way through the Probate and Family Court. In February 2021, Bill and Dalia sought to intervene, and Bill sought permission to testify remotely during the trial. Both motions were denied, though Bill and Dalia's CPA was permitted to testify remotely.

Finally, on July 22, 2022, a judgment of divorce nisi entered in the divorce action. Under Massachusetts law, the divorce judgment does not become final until ninety days after it is entered. With respect to the distribution of property, the judgment provided as follows:

> a. <u>Real Estate</u>: Mother shall retain the former marital home located at 40A McCarthy Road, Tyringham, Massachusetts, free and clear from any claim by Father. Within sixty (60) days, Father shall transfer to Mother a deed conveying all of his right, title and interest in and to this property. There are two structures on the former marital home: a dwelling referred to as the "Red Barn" and a nearly complete studio referred to as the "Studio." Concurrent with delivering the deed, Father shall deliver to Mother exclusive possession of the Red Barn.
> \*\*\*
> c. <u>Liabilities</u>:
> \*\*\*
>> ii. <u>Two Million Dollar Promissory Note in Favor of William H. Wendt and Dalia K. Wendt:</u> To the extent this constitutes a legal obligation, Father shall be solely responsible for its satisfaction. Mother has no obligation to repay any funds to William H. Wendt and/or Dalia K. Wendt. The Husband shall indemnify and hold the Wife harmless from any and all costs, including attorneys' fees associated with collection efforts taken by William H. Wendt and Dalia K. Wendt against Mother.
>
> d. <u>Payment</u>: To create an equitable distribution of the marital estate, Mother shall tender to Father good and sufficient funds in the amount of TWO HUNDRED FIFTY THOUSAND and 00/100 ($250,000.00) DOLLARS. This payment shall be made by June 1, 2027 and shall carry simple interest in the amount of 4.75% per annum (the current Prime Rate).

(Dkt. No. 81, Ex. G, pp. 3-5.)

The following month, Bill and Dalia voluntarily dismissed, without prejudice, the action they had brought against Molly in June 2021 and assigned their interest in the Property to the 2022 Trust. Their attorney also issued a Notice of Sheriff's Sale on Execution of the "[u]ndivided one-half interest of the judgment debtor William G. Wendt in the Real Property at 40 McCarthy Road [sic]." (Dkt. No. 6-12.) Plaintiff filed this action a week later.

On September 21, 2022, Will delivered a signed release deed conveying all his right, title and interest in the Property to Molly. She resumed living in the Red Barn as soon as permitted under the divorce judgment and continues to reside there with the children. The divorce judgment, except for the provisions regarding the parenting schedule, was affirmed by the Massachusetts Appeals Court on May 15, 2024. (Dkt. 81, Ex. H.)

## IV.   DISCUSSION

"The concept of a tenancy by the entirety is one of ancient common law origin; it has been described as a form of concurrent ownership that may exist only between co[-]owners who are husband and wife." *Coraccio v. Lowell Five Cents Sav. Bank*, 612 N.E.2d 650, 652 (Mass. 1993). "A tenancy by the entirety 'continues during the existence of the marital relationship and cannot be changed except by death, divorce, a deed of both parties or a deed of one spouse to the other.'" *In re Snyder*, 249 B.R. 40, 44 (1st Cir. B.A.P. 2000) (quoting *Campagna v. Campagna,* 150 N.E.2d 699, 703 (Mass. 1958)). As the Massachusetts Supreme Judicial Court has explained, spouses who hold property in a tenancy by the entirety "'are seised of the estate so granted as one person, and not as ordinary joint tenants or tenants in common, and an incident of such an estate is that the survivor of the marriage is entitled to the whole, a right which one cannot destroy without the assent of the other.'" *Id.* at 653 (quoting *Raptes v. Pappas,* 155 N.E. 787 (Mass. 1927)). "[A]t common law, the husband in a tenancy by the entirety was entitled to exclusive possession and control of the

8

property[,]" but the wife's "right of survivorship in a tenancy by the entirety was indestructible." *Id.* A husband could unilaterally encumber his interest in the tenancy, but, "if the husband died before the wife, the creditor lost all of his interest." *Id.*

In Massachusetts, the passage of statutes recognizing the rights of married women did not change the common law rights husbands held in tenancies by the entirety, but "[i]n an attempt to equalize the right of men and women," the legislature adopted Mass. Gen. Laws c. 209, § 1, which applies to all tenancies by the entirety created after February 11, 1980. *Id.* at 653-54. Under the statute, spouses are "equally entitled to the rents, products, income or profits and to the control, management and possession of property held by them as tenants by the entirety," regardless of gender. Mass. Gen. Laws c. 209, § 1. The statute also provides that "[t]he interest of a debtor spouse in property held as tenants by the entirety shall not be subject to seizure or execution by a creditor of such debtor spouse so long as such property is the principal residence of the nondebtor spouse; provided however, both spouses shall be liable jointly or severally for debts incurred on account of necessaries furnished to either spouse or to a member of their family." *Id.*

Though Mass. Gen. Laws c. 209, § 1 made significant changes to tenancies by the entirety, the Massachusetts Supreme Judicial Court has explained that "[t]he statute did not . . . alter the characteristics of the estate itself." *Corracio*, 612 N.E.2d at 654. While spouses now enjoy equal rights to possession and control regardless of gender, "it does not follow that each has an equal one-half interest in the property." *Id.* Instead, a tenancy by the entirety remains a "unitary title" and "[e]ach spouse continues to have a indestructible right of survivorship, and the estate remains inseverable and not subject to voluntary partition." *Id.*

Additionally, there are significant limits on the rights of creditors with respect to a principal residence held as joint tenants by the entirety. *Id.* While a creditor may attach a debtor spouse's interest in such a property, thereby protecting the creditor's interest against the debtor spouse's

9

other creditors, they may not execute the attachment so long as the property remains the non-debtor spouse's principal residence and the spouses remain married. *Peebles v. Minnis*, 521 N.E.2d 1372, 1373 (Mass. 1988). The creditor may lose their interest in the property should the non-debtor spouse be the survivor of the marriage. *In re Minkina*, 79 F.4th 142, 150-51 (1st Cir. 2023) (explaining that the interest a creditor "acquires through the conveyance [of one spouse] 'would . . . be wholly defeasible upon the death of the conveying spouse and survivorship of the other.'" (quoting *In re Snyder*, 231 B.R. 437, 443 (Bankr. D. Mass. 1999), *aff'd as modified*, 249 B.R at 47)). Alternatively, the creditor's interest could become subject to execution if the debtor spouse is predeceased by the non-debtor spouse, the spouses agree to sell the property, the property ceases to be the non-debtor spouse's principal residence, or the spouses divorce and the property is apportioned between the spouses as tenants in common. *In re Snyder*, 249 B.R. at 44); *see also Peebles*, 521 N.E.2d at 1373.

Thus, Massachusetts law is clear that, so long as the Property remained Molly's principal residence, the Trust could not have executed on its attachment if Will predeceased Molly during their marriage. On the other hand, the Trust would have been able to execute on its attachment during the marriage, if Molly and Will had decided to sell the Property or it had ceased to be Molly's principal residence. Additionally, the Trust could have executed on its attachment had Will been a surviving spouse or had their divorce proceeding apportioned the Property between them.

In this case, there was no execution before Molly and Will's marriage ended in divorce and their divorce judgment did not divide the Property to be held as tenants in common. Instead, the court overseeing their divorce determined that an equitable division of the marital property included Will being solely responsible for the legal obligations created under the Promissory Note; Molly paying Will $250,000; and Will conveying his entire interest in the Property to Molly prior to the

10

divorce becoming final, so that she left the marriage as the sole owner of the Property.[2] Thus, the salient legal question is whether the Massachusetts Family and Probate Court has authority to equitably allocate all marital debts and assets, regardless of a preexisting attachment on a debtor spouse's interest in a property held in a joint tenancy by the entirety.

The Trustee asserts that, as matter of Massachusetts law, preexisting attachments must survive a divorce because the alternative invites fraud and is unjust to creditors, who, like Bill and Dalia, might not be permitted to intervene in the divorce action. Molly takes the alternate position, arguing that the property allocation set out in the judgment of divorce nisi fully dictates what former marital property can be available to a debtor spouse's creditors following divorce. Specifically, she asserts that since Will never possessed a divided interest in the Property, there was no divided interest for the Trust to attach.

Although Massachusetts has excised certain historic features of the joint tenancy by the entirety in order to treat spouses equitably regardless of gender, case law continues to recognize that the unitary title provides unique protections to a non-debtor spouse. *See e.g. In re Minkina*, 79 F.4th at 148-49; *Corraccio*, 612 N.E.2d at 654. Those protections necessarily mean that creditors who attach the undivided interest of one spouse to secure a debt solely belonging to that spouse face different risks than when they secure a debt incurred by both spouses or attach a divided interest. During the marriage, the creditor can seize or execute an attachment only if the creditor can prove the property is no longer the principal residence of the non-debtor spouse or that the debt was "incurred on account of necessaries furnished to either spouse or a member of their family." Mass. Gen. Laws c. 209, § 1.

---

[2] Pursuant to Mass. Gen. Laws, c. 208, § 21, "[j]udgments of divorce shall in the first instance be judgments nisi, and shall become absolute after the expiration of ninety days from the entry thereof." Thus, the language in the judgment of divorce nisi ordering Will to convey his interest in the Property to Molly within sixty days evidences the court's intent that Will's interest in the Property would not survive the termination of the marriage.

Additionally, creditors face the risk that the debtor spouse's interest in the property will terminate upon the end of the marriage and the non-debtor will become the sole owner of the property. This can occur due to the death of the debtor spouse or a divorce judgment granting all rights to the property to the non-debtor spouse. In the absence of statutory language distinguishing between these two different outcomes, this court finds no basis for creating a distinctoion here. "[A]n equitable, rather than an equal, division of property is the ultimate goal" of the statutory provision governing the division of the marital estate upon divorce and judges are given "considerable discretion in making an equitable division of property." *Williams v. Massa*, 728 N.E.2d 932, 939, 942 (Mass. 2000). The breadth of discretion granted to Probate and Family Court judges and the overarching goal of property distributions in divorce proceedings are incompatible with the Trust's argument that preexisting attachments must survive a divorce judgment granting all interest in the relevant property to a non-debtor spouse.

However, this does not mean that a creditor who is unable to participate in a divorce is without recourse. A creditor who believes former spouses entered into a divorce in order to fraudulently transfer assets can seek a redistribution of marital assets. *United States v. Baker*, 852 F.3d 97, 103-04 (1st Cir. 2017) (affirming district court's finding that former spouses used their divorce to fraudulently transfer assets and remanding to district court for an appropriate equitable distribution based on the mandatory factors listed in Mass. Gen. Laws c. 208, § 34). Alternatively, a creditor may be able to attach the non-debtor spouse's interest in the former marital property if the creditor can establish that the non-debtor spouse is jointly or severally liable for the underlying debt. Mass. Gen. Laws c. 209, § 1. In fact, Bill and Dalia took that position in the separate state court action against Molly, and others, which they dismissed without prejudice following entry of the divorce judgment nisi, and the Trustee has advanced the same argument here.

Neither the statute, nor published judicial decisions issued in the last 100 years, defines the term "necessaries." The Massachusetts Supreme Judicial last addressed the question in 1922, in a decision applying a common-law precursor to the current statute pursuant to which a husband was liable for expenses his wife incurred for "necessaries." *Jordan Marsh Co. v. Cohen*, 136 N.E. 350, 351 (Mass. 1922). In that context, the court explained that "[t]he term 'necessaries' . . . is not confined to articles of food or clothing required to sustain life, but has a much broader meaning and includes such articles for use by a wife as are suitable to maintain her according to the property and condition in life of her husband." *Id.* Even applying this "broader" meaning, the court concludes no reasonable jury could find the funds advanced by Bill and Dalia were used to provide "necessaries" to Molly, Will, or their children.

The substantial amount of funding allocated and spent are in line with high end betterments, improvements, and additions—this outlay of money was clearly opulence over necessity. Enormous sums were spent on a structure whose primary purpose was intended to be a photography studio for Will. The structure was not designed to be the family's permanent residence, but was to include living space the family could occupy while building a new home to replace the Red Barn. The planned living space was not completed, and the Red Barn, never demolished, remains the only residence on the Property. Molly resumed living in the Red Barn after the divorce judgment entered and the children have lived there continuously. While there are factual disputes in this case concerning Molly's involvement in the construction process and whether all the funds expended by Will were actually spent on the project, these disputes are not material to the question of whether any portion of the funds was used to sustain or maintain the household at the family's accustomed standard.

## V. CONCLUSION

For the foregoing reasons, the court concludes (1) the Trust holds no interest in the Property and (2) no portion of the funds advanced by Bill and Dalia were spent on "necessaries" for Molly, Will, or the children. The court's order granting Molly's motion for summary judgment (Dkt. No. 79) and denying the Trustee's motion for summary judgment (Dkt. No. 83) was entered on March 31, 2025. Plaintiff shall submit a proposed judgment within twenty-one days of the date of this memorandum and order. Defendant shall raise any objections to the proposed judgment in writing, filed no later than fourteen days after Plaintiff's filing of the proposed judgment.

It is So Ordered.

  /s/ Mark G. Mastroianni
MARK G. MASTROIANNI
United States District Judge